No. 59,714
JAMES R. HOLLEY, a/k/a BOB HOLLEY, *Appellee,* v. ALLEN DRILLING
COMPANY, *Appellant.*
(740 P.2d 1077)

Opinion filed July 17, 1987.

*Lee Turner,* of Turner and Boisseau, Chartered, of Great Bend, argued the cause, and *Casey R. Law,* of the same firm, was on the briefs for appellant.

*Michael S. Holland,* of Russell, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This case involves an alleged oral contract between defendant/appellant, Allen Drilling Company, and plaintiff/appellee, James Robert (Bob) Holley. Allen Drilling Company appeals from the trial court's grant of judgment in favor of Holley.

In 1977, Bob Holley was hired by Earl Allen, who was then president and sole stockholder of Allen Drilling Company, as an oil well driller and tool pusher for the company. Holley worked for Allen Drilling until December of 1980, when he quit over a bonus dispute. He then went to work for Kaw Drilling Company.

About a month after Holley began working for Kaw, he met with Earl Allen at Allen's request at Sambo's Restaurant in Great Bend. Allen told Holley that if he would come back to work for Allen Drilling, he would give him a $10,000 bonus (for the prior year) and "15% off the top of what the rig (rig No. 5) made." At trial, Holley explained this agreement as follows:

"He told me he would give me that $10,000 bonus and that Rig 5 was mine and I would have 15 percent of it and rig it up like I wanted it and take it to the field the way I wanted it and I said okay."

Holley returned to work for Allen Drilling on January 26, 1981. In March he received a check drawn on Allen Oil Company for $10,000. Earl Allen died in a plane crash in September of 1982. At the time of Earl Allen's death, Holley had not received his claimed 15% share of the rig because Earl had "put it into production."

Holley continued to work for Allen Drilling until August 30, 1983, when he quit because of a vacation dispute he had with the company's new president, Dixon Allen (Earl Allen's son). Holley then went to work for WesTech Energy. Holley filed this action on June 4, 1984, seeking specific performance of the alleged oral agreement.

By stipulation of the parties, the trial of this case was bifurcated. The first part of the trial pertained to whether an oral contract existed between Holley and Allen Drilling and, if so, its terms. In addition to his own testimony, Holley presented the testimony of Lyle Jurgensen, his former employer. Jurgensen testified that Holley told him he went back to work for Allen Drilling in exchange for a "substantial bonus and/or a percentage of the rig." Jurgensen didn't remember exactly what percentage of the rig Holley was to receive, only that it was "considerable."

Keith Huddleston, an electrical worker for Allen Drilling, also testified at trial. Huddleston testified that Earl Allen twice told him that Bob Holley came back to work for Allen Drilling in exchange for a "percentage of the rig." Huddleston, like Jurgensen, could not remember the percentage of the rig Holley was to receive.

Two other Allen Drilling employees, John Johnson and Joe Levingston, testified that Bob Holley had told them about his oral agreement with Earl Allen. However, both Johnson and Levingston testified that Holley made inconsistent statements regarding the percentage of the rig he was to receive.

After hearing the evidence, the jury determined Bob Holley agreed to return to work for Allen Drilling in exchange for a $10,000 bonus and "15% of all income earned for Rig No. 5."

The second portion of the case was tried to the court and pertained to the damages sustained by Holley. The trial court heard evidence which included the meaning of "off the top" or "off the top of what the rig made"; and the appellant's affirmative defenses of estoppel, laches, and waiver. The trial court ruled that "off the top" referred to "the charge that was made by the company for drilling on a per foot basis." The court then determined the total drilling charge by the company for the operative period was $3,136,012.00 and 15% of that amount, or $470,401.80, was the amount owed to Holley. The court then reduced this sum by the amount of salary paid Holley for that period, leaving a net award to plaintiff of $356,475.25.

Allen Drilling Company appealed.

The appellant first contends the trial court erred in denying defendant's motion for directed verdict and for judgment notwithstanding the verdict because the alleged oral contract was

too indefinite and uncertain in its terms to constitute an enforceable agreement.

In ruling on a motion for a directed verdict, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. This rule is also applicable when appellate review is sought on a motion for directed verdict. Further, the same test is applicable to a motion for judgment notwithstanding the verdict. *Turner v. Halliburton Co.*, 240 Kan. 1, 6-7, 722 P.2d 1106 (1986).

Appellant claims the plaintiff's statements that he was to receive "15% of what the rig made" or 15% "off the top" are simply too indefinite to be enforceable and neither the jury nor the court was presented with a definite and certain basis for the calculation of the 15% figure.

In *Richards Aircraft Sales, Inc. v. Vaughn,* 203 Kan. 967, 971, 457 P.2d 691 (1969), this court held:

"As a general rule, in order for a written agreement to be binding it must be sufficiently definite in its terms and requirements as to enable a court to determine what acts are to be performed and when performance is complete. This rule, however, cannot be blindly followed as a measuring stick for determining the sufficiency and definiteness of the terms of a contract. Where a purported contract is so vague and indefinite that the intention of the parties cannot be ascertained therefrom it is unenforceable; but absolute certainty is not required—only reasonable certainty is necessary. A contract may contain some formal imperfections or be lacking in detail, but it will not fail for uncertainty if the court can ascertain the terms and conditions by which the parties intended to be bound, and thus carry their intentions into effect. *The fact that the exact meaning of language used can be ascertained only by consideration of extrinsic evidence does not render the agreement unenforceable for indefiniteness or uncertainty.*" (Emphasis added.)

See *Brown v. Foulks,* 232 Kan. 424, 434, 657 P.2d 501 (1983).

Moreover, in *Hays v. Underwood, Administrator,* 196 Kan. 265, 268, 411 P.2d 717 (1966), we held the law favors upholding a contract against a claim of uncertainty where one of the parties has performed his part of the contract.

In the instant case, an exception to the general rule requiring definiteness and certainty in contracts is applicable because the

appellant had partially performed the agreement by paying Holley $10,000 and Holley had gone back to work for Allen Drilling Company. Further, the agreement is not unenforceable merely because the language of the contract was ambiguous or unclear. Bob Holley consistently testified to the essential terms of the agreement—that he would receive a $10,000 bonus and 15% "off the top" of what the rig made if he returned to work for the appellant. The fact that the term "off the top" may have been ambiguous did not render the agreement unenforceable. Rather, it merely made resort to extrinsic evidence permissible.

Both the jury and the trial court heard extrinsic evidence regarding the meaning of the ambiguous term. Holley testified as to the discussion he had had with Earl Allen concerning the basis for the 15% figure.

"Q: Did you have a clear understanding as to what precisely you were to get?
"A: You mean what I was supposed to receive?
"Q: Right.
"A: I was supposed to receive 15 percent of what Rig 5 made.
"Q: And what was your understanding as to—what did Mr. Allen tell you or what was your understanding or was it even discussed as to what that meant?
"A: Well, just whatever it made, I got 15 percent of it. I told him, 'Well, you can show records, you ain't going to make no money off the rig.' *And he said, 'It's right off the top, Bob, I ain't going to cheat you.'*" (Emphasis added.)

Further, plaintiff presented the expert testimony of C.P.A. Tom Drake regarding the meaning of "off the top" in the oil and gas industry. The accountant testified that "off the top" generally refers to the top line of a profit and loss statement—*e.g.,* gross sales.

On the other hand, defendant's accountant, C.P.A. Bert Erwin, testified that a contract calling for "15% off the top" would create "immediate questions" and "would need to be defined."

Considering the evidence in a light most favorable to the plaintiff, it is clear the trial court did not err in denying appellant's motions for directed verdict and judgment notwithstanding the verdict. Holley consistently testified regarding the terms of the agreement and his testimony was corroborated by at least two other witnesses. Moreover, the contract between Holley and Allen Drilling contained definite and certain terms, although the language of the contract was ambiguous. This

ambiguity was appropriately resolved by the trial court by resort to extrinsic evidence.

Appellant next contends the trial court erred in failing to require plaintiff's expert witness, C.P.A. Tom Drake, to reveal the names and contractual arrangements of certain clients.

During the second phase of the trial which was to the court, plaintiff presented Drake's testimony to show that the phrase "off the top" generally refers to a percentage of gross sales or revenues. Drake further testified that "off the top" employment contracts are not uncommon in the rotary drilling industry.

Upon cross-examination, the appellant attempted to obtain the names of specific clients of Drake who had utilized "off the top" employment contracts. Drake refused to disclose such information and the appellant objected. After further inquiry of the witness by the court, a recess was taken during which K.S.A. 1-401(b) was presented to the court. It provides:

"No certified public accountant shall be examined through judicial process or proceedings without the consent of the client as to any communication made by the client to the certified public accountant in person or through the media of books of account and financial records, or as to advice, reports or working papers given or made thereon in the course of professional employment, nor shall a secretary, stenographer, clerk or assistant of a certified public accountant be examined without the consent of the client concerned, concerning any fact the knowledge of which any such person has acquired in such capacity or relationship with the certified public accountant. This privilege shall exist in all cases except when any such communication is material to the defense of an action against a certified public accountant and as otherwise provided by this section."

On the basis of the statute, the court determined the information sought by the appellant was privileged and need not be revealed by the witness.

On appeal, the appellant does not challenge the court's interpretation of K.S.A. 1-401 or its applicability here. Rather, appellant argues the court erred in denying appellant the right to cross-examine the expert witness regarding his knowledge and qualifications as an expert witness.

This argument lacks merit for several reasons. First, we have held the trial court has wide discretion in allowing the testimony of expert witnesses and the use of such testimony ordinarily goes to the weight of the evidence and not its admissibility. *Kearney v. Kansas Public Service Co.*, 233 Kan. 492, Syl. ¶ 6, 665 P.2d 757 (1983).

Here, the trial court cannot be said to have abused its discretion by upholding the statutorily authorized accountant-client privilege, particularly where, as here, the objecting party does not challenge the applicability of the privilege.

Further, the appellant was permitted to question Drake as to whether he had, in his experience, ever seen a percentage of gross sales paid as incentive to an individual in the rotary drilling business. Drake responded that he had seen such contracts. Drake further testified on cross-examination that the phrase "off the top" is a common term used in many industries, including the oil and gas industry, and is a commonly accepted accounting term. Thus, the court permitted the expert witness to render his opinion upon facts within his personal knowledge and observation.

We hold the trial court did not abuse its discretion by permitting the witness to testify regarding the meaning of "off the top" in the oil and gas industry without revealing the names and contractual arrangements of particular clients.

The final issue on appeal is whether the trial court erred in denying appellant's equitable defense of estoppel.

We recently defined the concept of equitable estoppel and reviewed its elements in *Ram Co. v. Estate of Kobbeman,* 236 Kan. 751, Syl. ¶¶ 4 and 5, 696 P.2d 936 (1985):

> "Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts."

> "There can be no equitable estoppel if any essential element thereof is lacking or is not satisfactorily proved. Estoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction."

Appellant argues that Bob Holley was estopped from asserting the enforceability of the contract because of his failure, after Earl Allen's death, to inform the appellant of the existence of the agreement.

While it is true that mere silence may give rise to an estoppel where under the circumstances there is a duty to speak, the trial

court found there was no such duty in this case. The court reasoned:

"With regard to the defense of estoppel, this defense fails because the court can find no duty on the part of the plaintiff to inform the employer corporation of the employment contract that had been made between himself and the corporation's agent, Mr. Earl Allen. This is particularly true when a portion of that employment contract had already been performed, the $10,000 bonus was paid. Mr. Holley had every reason to believe that the corporation knew of the employment contract. It was half performed."

Further, it is clear Earl Allen was acting within the scope of his authority as an agent of Allen Drilling when he contracted with Bob Holley. We have held that the knowledge obtained by an agent acting within the scope of his authority is, in law, the knowledge of the principal. *Mackey v. Board of County Commissioners,* 185 Kan. 139, Syl. ¶ 5, 341 P.2d 1050 (1959). See *Board of Leavenworth County Comm'rs v. Cunningham,* 5 Kan. App. 2d 508, 512, 619 P.2d 525 (1980). Thus, Allen Drilling cannot now contend Bob Holley had a duty to inform it of the authorized acts of its agent.

The elements of equitable estoppel were not established and the trial court did not err in rejecting this defense.

This is primarily a fact case. There is substantial competent evidence supporting the verdict and findings of fact. The scope of appellate review does not permit disturbing a factual determination under such circumstances.

The judgment of the trial court is affirmed.